## Daniels *v.* Notor, Appellant.

Argued March 25, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Paul W. Reeder*, with him *Seth McCormick Lynn* and *Furst, McCormick, Muir & Lynn*, for appellant.

No argument was made nor brief submitted for appellee.

512

OPINION BY MR. CHIEF JUSTICE JONES, June 28, 1957:

The plaintiffs, husband and wife, instituted this suit in equity seeking to restrain the defendants, also husband and wife, from the use of a five-unit motel, which they were erecting on their property, on the ground that it constituted a violation of a restrictive covenant, running with the land, in the deed to the defendants. The court below granted the relief prayed for, and, from the final decree entered, the defendants took this appeal.

In 1928, Miss Ellen J. Bennett acquired by grant a tract of land in Loyalsock Township, Lycoming County. In 1929 she caused a portion of the tract to be subdivided into 81 lots, each measuring approximately 50 by 150 feet. The lot plan, which was in the shape of a parallelogram, was bisected on its longitudinal axis by Pennsylvania State Highway Route 15 which in the locality runs substantially north and south. On the east side of Route 15 there were 40 lots in 2 rows of 20 lots each with the rows separated by a 20-foot alley, and, to the west of the highway, there were 41 lots divided into 2 rows, also separated by a 20-foot alley. The subdivision plan was never recorded, but, between 1929 and 1948, Miss Bennett sold and conveyed several of the lots on the west side of the highway according to the boundaries as shown on the plan. There were involved all told in these conveyances 16 lots to 5 grantees. Each of the deeds bore a restrictive covenant identical to the first deed which was executed and delivered in 1929. The presently material portion of this covenant reads as follows,— "No store gasoline station or other commercial enterprise shall be erected or conducted upon said land, but it shall be used only for a private dwelling. The premises shall at no time be used for any immoral or illegal purpose."

Following Miss Bennett's death, her executor, on November 24, 1948, conveyed her interest in the tract, including the unsold lots in the plan, to Charles C. Brannaka without reciting any restrictions whatsoever in the deed. Brannaka, in turn, conveyed to four grantees 6 of the lots located on the western side of the highway and included a restrictive covenant in the deeds identical to that contained in Miss Bennett's first grant. He also sold 2½ lots abutting the eastern edge of the highway and included a like restriction in those deeds. However, Brannaka sold the 2 southernmost lots abutting the western side of the highway without any use restrictions and later conveyed all of the remaining 37½ lots in the eastern portion of the tract to one Carl Bauer without any restrictions other than that "The premises nor any part thereof, shall [not] be used or occupied for the purpose of the sale or dispensing of intoxicating beverages, or for the purpose of maintaining a commercial junk yard." The net result of all these transactions is that, of the original 81 lots embraced by Miss Bennett's plan, over 40 of them may now be used for commercial enterprises. The restricted lots include the first 18 contiguous lots on the western side of the highway proceeding from north to south (a total highway frontage of 1038.2 feet), some few lots in the row behind the 18 lots just mentioned and 2½ lots abutting the opposite side of the highway.

Both the plaintiffs and the defendants own and occupy lots which bear the restrictive covenants imposed by Miss Bennett, the plaintiffs having acquired their title directly from her in 1946, and the defendants having acquired their title by mesne conveyance in 1950.

In 1949 the plaintiffs built a dwelling on their 3 lots, fronting on the western side of the highway, and have since resided there. They later acquired several lots to the rear of their lots abutting on the highway.

In 1951 the defendants built a residence on their two lots which adjoin the plaintiffs' property. This dwelling is a duplex with separate accommodations for the defendants' daughter and her husband and for the defendants, all of whom are presently residing in the dwelling.

In May of 1955 the defendants started construction of a five-unit motel on their property between their residence and that of the plaintiffs. The plaintiffs promptly engaged counsel who endeavored to have the defendants' construction discontinued. The defendants refused so to do, and the plaintiffs instituted this action seeking injunctive relief. Before a hearing was had on the complaint, however, the defendants had completed the motel at a cost of $15,416 and had put it into operation. After hearing, the chancellor issued an injunction enjoining and perpetually restraining the defendants from conducting or erecting on their land "any commercial enterprise, including a motel, and from using any construction on their land for any other purpose than for a private dwelling . . . ." After argument on exceptions filed by the defendants to the decree nisi, the court en banc made additional findings of fact but entered the final decree from which this appeal was taken. The plaintiff-appellees have not entered an appearance nor filed a brief in this court on the appeal.

The suit was defended in the trial court on the grounds that the neighborhood had so changed as to make it impossible any longer to effect the purpose of the restrictive covenant; that the covenant is unenforceable, being of no "substantial" use to the dominant tenement; and that continued violation of the covenant by the plaintiffs and their failure to object to violations of the same restrictive covenant by other lot owners barred the plaintiffs from any right to enforce the restrictive covenant against the defendants. Only

the first two of the above contentions are raised on this appeal and present but complementary angles of the same proposition.

In *Kelly v. Philadelphia,* 382 Pa. 459, 465, 115 A. 2d 238, it was said that "While it is true that findings of fact made by a chancellor, confirmed by the court en banc, will not ordinarily be reversed on appeal when supported by adequate evidence, conclusions whether of law or ultimate fact are no more than his reasoning from the underlying facts and are reviewable: Law v. Mackie, 373 Pa. 212, 223, 95 A. 2d 656; Peters v. Machikas, 378 Pa. 52, 56, 105 A. 2d 708, and cases cited therein." The instant case presents a striking illustration of the procedural situation last above contemplated. None of the underlying facts is in dispute but, superimposed on these facts is a two-pronged question, namely, what should be considered as a neighborhood under the particular facts of this case, and has the character of the neighborhood so changed since the imposition of the restrictive covenants that equitable relief should be withheld. "Where the exigencies of altered conditions in a neighborhood render a strict adherence to the terms of the restrictive covenant useless to the dominant tenement, or absurd, or futile, or ineffective to achieve the end desired, it would be an anachronism to interpose equitable relief in support of it": *Henry v. Eves,* 306 Pa. 250, 260, 159 A. 857. Since the solution the court below gave these questions is but its own conclusions from undisputed facts, the merit of its action is reviewable here.

The court en banc found that "The restricted area in question is a neighborhood in itself, laying on the west side of the road." It is, of course, true that "In considering whether a 'neighborhood' is residential, the test is the immediate, not the remote, neighborhood": *Price v. Anderson,* 358 Pa. 209, 218, 56 A. 2d 215. How-

ever, the instant case presents a relatively unique situation. Route 15, upon which the respective lots of the plaintiffs and defendants abut, is a principal highway from Buffalo, New York, to Baltimore, Maryland. Traffic on it approximates 7,000 vehicles a day. Paralleling the highway to the west, at a distance of approximately 400 feet, is a railroad. The only side road in the vicinity is the alley separating the two rows of lots on the western side of the highway and the street giving access thereto from the highway. It is readily apparent, therefore, that any designated neighborhood in the particular locality would necessarily embrace an area greater in frontage on the highway than in depth therefrom.

Land development in the general area is of relatively recent occurrence with considerable acceleration in later years. When the first lot of the Bennett tract was sold in 1929 almost the entire area was farm land. Charles T. Knittle, the first purchaser of a restricted lot, bought the land with the intention of erecting a combination dwelling and tourist home. He actually conducted a tourist home in his dwelling from the time it was erected in 1929 until shortly before the institution of the instant action at which time he took down his sign advertising rooms but continued to use the building as a duplex dwelling. To the south and west of the Bennett tract, the area is yet undeveloped and unrestricted farm land. However, to the east, across the highway from the plaintiffs' and defendants' properties but within the original Bennett tract, are now located a motel, a guest house where, in addition to accommodations for itinerants, power lawn mowers and other power equipment are displayed and sold, and there is also a frozen custard stand. All of these business structures have been erected since 1950 and are within distances of from 80 feet to 305 feet distant from

the common property line between the plaintiffs' and the defendants' properties.

To the north, on both sides of the highway, the recent development has been almost exclusively commercial. Since 1950, the west side of the highway to the north of the plaintiffs' property has witnessed the introduction of a trailer camp, a transportation company garage and terminal, another trailer camp and a motel. All of these are from 300 feet to one-third of a mile of the plaintiffs' and defendants' common property line. During the same period on the east side of the highway to the north were built a drive-in theatre, a motel, a gasoline service station and a restaurant, which are from 600 feet to a half mile of the common property line of the plaintiffs and defendants. Prior to 1950 on the west side of the highway to the north of the plaintiffs' property there was a garage and gasoline station, another service station and an inn, while on the east side of the highway there was a large commercial junk yard, all of these being from 400 feet to a half mile of the plaintiffs' and defendants' properties.

The net effect of the commercial development in the locality has been that directly to the north of the Bennett tract, including both sides of the highway, which is the only road of any consequence in the area, there is now being conducted within a half mile of the plaintiffs' property two trailer camps, a freight terminal for a motor transportation company, three gasoline service stations, a restaurant and tavern, a garage, two motels, a large junk yard and a drive-in theatre. Nor do these include the three commercial enterprises located almost directly across the highway from the plaintiffs' property. The private dwellings in this area at the most number about 20, 7 of which are in the alleged restricted area.

In the light of the foregoing it seems clear that there has been a decided change in the character of this neighborhood since Miss Bennett imposed the first restriction in 1929. In the words of the wife-plaintiff, speaking with reference to Miss Bennett's intent to restrict the entire 81 lots,—"she wanted a little community like at Harrisburg, and she said no buildings, no gas stations, no stores, all she wanted was a residential section. That was her desire. And if she had lived, her promise, it would have been fulfilled." Such intention cannot, however, bind the remaining lots unless it was clearly expressed to each successive grantee, a circumstance not appearing of record in this case: *Ladner v. Siegel*, 294 Pa. 360, 364, 365, 144 A. 271. It is too clear for dispute that Miss Bennett's intention was completely frustrated by the course of subsequent events. Consequently, in view of all the circumstances and, in particular, the shift in the use of the property in the immediate neighborhood from agricultural (or partially residential) to commercial, due in large measure to the automobile as a principal means of travel, the issuance of an injunction in this case constituted a manifest abuse of discretion. Equity does not enforce such a restriction "if the nature of the neighborhood changes has been such as to make it impossible to accomplish the objects for which it was designed, even though such changes may have resulted from circumstances over which neither of the parties had any control. It being a general policy of the law that land shall not be burdened with permanent or long-continued restrictions which have ceased to be of any advantage, equity will not, in such cases, prohibit or retard improvements simply to enforce the literal observance of a condition or covenant": *Katzman v. Anderson*, 359 Pa. 280, 285, 59 A. 2d 85, and cases there cited.

A considerable portion of the testimony in the plaintiffs' case was adduced from a real estate expert, who asserted that the presence of the defendants' motel in close proximity to the plaintiffs' dwelling would depreciate the value of the latter approximately 40% or $8,-500. This testimony, which was controverted by the defendants' real estate expert, was apparently presented in an effort to bring the plaintiffs within the scope of the rule that "Notwithstanding that there may have occurred changes in the character and use of lands and buildings in the neighborhood, equity will restrain a violation of a building restriction if its enforcement remains of *substantial* value to the dominant tenement [citing cases]": *Katzman v. Anderson,* supra. However, the measure of alleged harm thus advanced (and apparently adopted by the chancellor when he stated that "The erection of a motel unquestionably causes adjoining residences to lose value" (is patently irrelevant. As noted by Justice (later Chief Justice) STERN in *Price v. Anderson,* supra, "The value referred to in the authorities is the benefit to the owner of the dominant tenement in the 'physical use or enjoyment of the land possessed by him': Restatement, Property, §537. 'It [the restrictive covenant] must in some way make the use or enjoyment more satisfactory to his physical senses.' "

The plaintiffs' objections to the defendants' motel are directed principally to the manner in which it is being operated rather than to the fact of its presence. The plaintiffs alluded to no injury they have suffered nor any lessening of the physical enjoyment of their property due to the presence of the defendants' motel other than what would be occasioned by the existence of a structure permissible under the restrictive covenant. In *Menger v. Pass,* 367 Pa. 432, 437, 80 A. 2d 702, we expressly held that a motel located within a

strictly residential neighborhood is not a nuisance *per se*. Of course, if it is operated in such a manner as to constitute a nuisance in fact, equity may be resorted to for appropriate relief.

Decree reversed; the respective parties to pay their own costs.

Mr. Justice BELL dissents.